UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| DARNELL SCOTT ANDERSON,<br><br>Petitioner,<br><br>v.<br><br>SHERMAN CAMPBELL,<br><br>Respondent. | Case No. 23-cv-12208<br><br>Honorable Robert J. White |

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

## I. Introduction

Petitioner Darnell Scott Anderson is a Michigan prisoner incarcerated at the Gus Harrison Correctional Facility in Adrian, Michigan. Petitioner is serving a controlling prison term of 16 to 30 years for his Barry Circuit Court conviction of multiple counts of criminal sexual conduct. Petitioner challenges the validity of his state convictions in this petition for writ of habeas corpus filed under 28 U.S.C. § 2254.

The habeas petition raises five claims: (1) Petitioner's Sixth Amendment right to counsel of choice was violated when the trial court denied his request to substitute his appointed attorney with one his family retained on the first day of trial, (2) Anderson's Sixth Amendment right to a jury drawn from a fair cross-section of the

community was violated where the jury venire contained a single African-American, (3) the prosecutor violated discovery rules by failing to disclose incriminating evidence that was later presented at trial, (4) Anderson's Fifth and Fourteenth Amendment rights were violated by the use of his pre-arrest silence at trial, and (5) the trial court violated state evidentiary rules by admitting prejudicial other-acts evidence. (ECF No. 1, PageID.5-12).

Respondent filed an answer to the petition asserting that Petitioner's first claim is without merit and that his remaining claims are procedurally defaulted. (ECF No. 10). Petitioner filed a reply. (ECF No. 13).

After careful consideration, and for the reasons set forth below, the Court denies the petition for writ of habeas corpus and denies a certificate of appealability.

## II. Background

Petitioner was charged with eleven counts of criminal sexual conduct after his seventeen-year-old stepdaughter Pamela disclosed to her mother that he had been sexually molesting her for several years.

At Petitioner's jury trial, two police officers testified that on January 7, 2019, they responded to a residence in Hastings to investigate a sexual assault. The officers found Pamela on a couch crying. Her mother, Holly Anderson, was also upset. While the officers were speaking with Anderson and Pamela, Petitioner called

Anderson on her cellphone. An officer spoke with Petitioner on the phone and told him to find another place to sleep that night. (ECF No. 11-7, at 169-78).

A few weeks later, on January 22, 2019, Dr. Debra Simms, an expert in the field of childhood sexual abuse evaluations, examined Pamela. (ECF No. 11-8, at 20-21). Pamela told Simms that Petitioner had been sexually assaulting her since she was twelve or thirteen years old. (*Id*. at 31). Pamela described how Petitioner began by showing her his penis and how his conduct escalated to touching her chest and genitals to oral sex and sexual intercourse. (*Id*. at 29-30). Petitioner also shaved Pamela's genital area and gave her drugs. (*Id*.). Simms's examination of Pamela's anal and genital area did not reveal any fresh or healed injuries. (*Id*. at 41). Her findings neither confirmed nor ruled out that there had been sexual penetration. (*Id*.).

Pamela told Simms that she had wanted to kill herself the night before the examination and had taken several pills. (*Id*. at 30-31). She thought that her mother and her young sister would be better off if she were not alive, and she did not want her sister to grow up without a father like she did. (*Id*. at 31-32). Simms brought Pamela's mother and sister into the room. When Simms told Anderson that she would be sending Pamela to the emergency room because of her suicidal ideation and attempted overdose, Anderson became enraged at Pamela. She said Pamela was lying, the evaluation was not necessary, and that she was trying to ruin Anderson

and her sister's lives. (*Id*. at 45-47). Simms eventually called security and 9-1-1 to control Anderson. Pamela was transferred to the emergency department. (*Id*.).

Pamela testified at trial that she was a senior in high school. She was eighteen years old at the time of trial. Prior to her disclosure, she lived with her mother, Petitioner, and her six-year-old half-sister. (ECF No. 11-7, at 181-82). Pamela testified that Petitioner's abuse began when she was eleven or twelve years old in the family's former residence in Grand Rapids. Pamela described how the acts of sexual abuse started with Petitioner showing her his penis and escalated to touching Pamela's body, manual stimulation of Petitioner's penis, oral sex, and ultimately vaginal sex. (*Id*. at 185-89).

Pamela testified that in the Spring of 2017 the family moved to Hastings. (*Id*. at 190). Pamela gave detailed descriptions of various acts of sexual touching and penetration that occurred with Petitioner at the Hastings residence. (*Id.* at 194-216). Petitioner had her try a white drug smoked from a pipe. (*Id*. at 216-17). Petitioner also had her watch pornography on his phone and asked her to do the things depicted in the videos. (*Id*. at 218-19).

During one of the last incidents, after Petitioner ejaculated inside Pamela's vagina, Pamela "started freaking out saying that this was over, we weren't going to do it anymore." (*Id*. at 220-21). Pamela was worried that she would become

pregnant. The next day Petitioner took her to Walgreen's where they bought a Plan B pill. (*Id*. at 222).

The events precipitating the disclosure of the sexual abuse involved Pamela's boyfriend, Dylan Mead. (*Id*. at 226). Neither Petitioner nor Pamela's mother liked Dylan. On one occasion, Petitioner insisted that Pamela prove to him that she had been with a female friend and not Dylan. (*Id*. at 225-28). Pamela had in fact been lying, she really had been with Dylan at a coffee shop, and so Petitioner had her come home and confiscated her phone and other electronic devices. (*Id*. at 227-28).

When Petitioner demanded that Pamela unlock her phone, he discovered suggestive photos of Pamela's female friend. He accused Pamela of having sex with her as well and slapped Pamela in the face. He later pressed his knuckle into her face hard enough to bruise it – photos of which were subsequently admitted at trial. (*Id*. at 228-31). Pamela said she was moving out of the house, and Petitioner said he would let her go only after smashing her phone. (*Id*. at 231-36). Pamela collected the pieces of her phone from her room and saved them in a plastic bag. (*Id*.).

Pamela walked to a McDonald's restaurant, where she and Dylan worked. (*Id*. at 237-38). Eventually, her mother came to the restaurant, and Pamela told her about the abuse she had received from Petitioner, and she eventually included descriptions of sexual abuse. (*Id*. at 238-39). Anderson told Pamela she should go to a doctor to prove it or confront Petitioner. She then drove Pamela home. (*Id*.).

Pamela repeated her accusations in front of Petitioner at home. Petitioner responded "Really? Really? You're going to do this? You're going to do this?" (*Id*.). He became aggressive and started "pacing around the house, stomping around, throwing his suitcase on the couch, throwing his clothes in the suitcase saying that he was leaving." (*Id*.). After Petitioner calmed down he said, "If I was going to prison, I was going to prison for a reason," and gave Pamela a "death look." (*Id*. at 242).

The next day Petitioner warned Pamela to watch her back. Pamela told her mother that she was going to leave because she was "scared to death and I thought he was actually going to kill me because of the threats and that I didn't even want to be at school or at the house or anywhere that he knew I would be." (*Id*. at 245). Anderson called some relatives for advice, and they told her to call the police. (*Id*.). She did, and the police came to their home that evening. (*Id*.). Pamela then moved to her step-grandfather's house. (*Id*. at 246-47).

Pamela testified that she did not disclose the sexual abuse earlier because she "didn't want to ruin the family" and because she did not want her sister to grow up without a father like her. (*Id*. at 248). She did not know the abuse was wrong when it first started, but later she understood that it was wrong. (*Id*.). When she started dating Dylan she wanted it to stop because it felt like she was cheating on Dylan.

(*Id*.). Pamela testified that the sexual abuse occurred "pretty often" until she moved out of the house. (*Id*. at 190).

Dylan Mead testified that he dated Pamela for a few months. (ECF No. 11-8, at 6-9). He described the incident in January of 2019 when Pamela got in trouble at the coffee shop for seeing him. He testified that Pamela received a call at the restaurant and started crying and said that she had to go home. The next day she walked to McDonalds where they worked. She was crying and had to use his phone to make a call. (*Id.*).

Holly Anderson corroborated Pamela's testimony regarding Petitioner's threat to "watch her back." (*Id.* at 156). He also threatened that if he was going to go to prison, he would make sure it was for a worthwhile reason. (*Id*. at 157). Nevertheless, Anderson admitted to having lots of contact with Petitioner even after the disclosure. (*Id*. at 158-59). She also acknowledged that she understood that her daughters would move out of the house, but she wanted to stay at the house with Petitioner herself. (*Id*. at 160).

Anderson recounted the dispute with Pamela about Dylan. (*Id*. at 163). She confirmed that Pamela's electronic devices were taken away and that Petitioner bruised her face. (*Id*. at 163-64). Pamela walked to McDonald's after the dispute. When Anderson spoke with her there, Pamela initially told her that she was not coming home because she did not like the rules at home. (*Id*. at 165). When

Anderson responded that everyplace has rules, Pamela told her that Petitioner was having sex with her. (*Id*. at 166). Pamela would not provide details, and eventually they went home to see how Petitioner would respond to the allegation. (*Id.*).

After the disclosure to the police and the resulting investigation, Anderson acknowledged that it was important for her to find out whether a Plan B pill was really purchased, as she knew it was not bought for her. (*Id*. at 170-74). She was surprised when a handgun was retrieved from her attic and turned over to the police. (*Id*. at 183-84). She did not know one was there, but Pamela knew about it. (*Id*.).

Michigan State Police Detective Kyle Bowers testified as an expert in the forensic examination of computers and cellphones. (ECF No. 11-8 at 114). Bowers examined Pamela's broken cell phone. (*Id*. at 115). The screen was cracked and the phone did not work. (*Id*. at 116). After Bowers repaired the phone he was able to extract the data. (*Id*.). Bowers also determined that the phone had the applications described by Pamela and contact information for Petitioner. (*Id*. at 122-23).

Peter Denton, an assistant store manager with Walgreen's, confirmed the sale of a Plan B pill on a date consistent with Pamela's account. (*Id*. at 205-15). Hastings Police Detective Eric Ingram obtained records indicating that the Plan B pill was purchased with Petitioner's debit card and that a Walgreen's loyalty number registered to Anderson was associated with the purchase. (*Id*. at 220-232).

Relevant to one of Petitioner's claims, Detective Ingram testified that early in the investigation he spoke on the phone with Petitioner and asked him to provide bank records to see if they contradicted Pamela's story about the Plan B pill purchase. (*Id.* at 228-229). Petitioner would not cooperate and told the officer that his attorney told him not to speak to him. (*Id.* at 229). Defense counsel's objection to the testimony was sustained on the ground that Petitioner was exercising his right not to speak with the police. (*Id.*). The prosecutor also referred to Petitioner's failure to cooperate with respect to his bank records in opening statements (ECF No. 7-7, at 155-58) and closing arguments. (ECF No. 7-9, at 98). Defense counsel did not object to those two comments.

The jury found Petitioner guilty of five counts of third-degree and fourth-degree criminal sexual conduct and acquitted him of multiple counts of first-degree and second-degree criminal sexual conduct. (*Id*. at 155-59).

Following sentencing, Petitioner filed a direct appeal. His appellate counsel filed an appellate brief in the Michigan Court of Appeals that raised five claims:

> I. The trial court abused its discretion when it denied defendant his constitutional rights to counsel of his choice.
>
> II. The trial court violated defendant's state and federal constitutional rights to equal protection and a jury drawn from a cross-section of the community.
>
> III. The prosecutor violated discovery and the late disclosure of information contained in a second cell phone the complainant had access to and the allegation that Mr. Anderson had a gun in the home

> denied Mr. Anderson his state and federal constitutional rights to due process and his right to a fair trial.
>
> IV. The prosecutor violated appellant's state and federal due process rights to a fair trial and used appellant's pre-arrest silence as substantive evidence of guilt and the trial court abused its discretion allowing this evidence to be heard by the jury.
>
> V. Mr. Anderson is entitled to a new trial because the trial court admitted prior acts evidence that was logically relevant only to character and without proper MRE 404b(2) notice, and even if the evidence was admissible for a proper purpose, the probative value of the evidence was substantially outweighed by the danger of undue prejudice.

(ECF No. 11-11, PageID.1891-92).

The Michigan Court of Appeals affirmed. *People v. Anderson*, No. 352523, 2021 WL 4494478, at *9 (Mich. Ct. App. Sept. 30, 2021). Petitioner appealed to the Michigan Supreme Court, but his application for leave to appeal was denied by standard form order. *People v. Anderson*, 974 N.W.2d 211 (Mich. 2022) (Table).

Petitioner's habeas petition originally raised the five claims that he exhausted on direct appeal and some additional claims that he did not exhaust. (ECF No. 1). The Court ordered Petitioner to either delete the unexhausted claims or return to the state courts to exhaust them. (ECF No. 5). Petitioner chose to delete the unexhausted claims. (ECF No. 6).

## III. Standard of Review

28 U.S.C. § 2254(d) limits federal habeas review of claims that were adjudicated on the merits by the state courts. A habeas petitioner must demonstrate

that the state court adjudication was "contrary to" or "involved an unreasonable application of" clearly established Supreme Court law. A decision is "contrary to" clearly established Supreme Court law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when a state court decision unreasonably applies the law of the Supreme Court to the facts of a prisoner's case." *Id.* at 409.

Under this standard a federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11. "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

## IV. Analysis

### *A. Counsel of Choice*

Petitioner first claims his Sixth Amendment right to counsel of choice was denied when the trial court refused to adjourn proceedings on the first morning of trial after Petitioner informed the court that he wished to replace his appointed

attorney with one his family had retained. Respondent asserts that the Michigan Court of Appeals reasonably rejected the claim on the merits.

The Sixth Amendment grants non-indigent defendants the right to choose their own counsel. *See United States v. Pancholi*, 148 F.4th 382, 395 (6th Cir. 2025) (citing *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). The right to choose one's own counsel is not absolute, however, and "is circumscribed in several important respects." *See Wheat v. United States*, 486 U.S. 153, 159 (1988). Relevant here, when a "motion for substitution of counsel [is] made close to the time of trial," a trial court may "rel[y] on instinct and judgment based on experience in making its decision." *Wheat*, 486 U.S. at 163. A trial court has "wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar." *Gonzalez-Lopez*, 548 U.S. at 152; *See also Morris v. Slappy*, 461 U.S. 1, 11 (1983). Only unreasoned "insistence upon expeditiousness in the face of a justifiable request for delay" will violate the right to retain counsel. *Morris*, 461 U.S. at 11-12 (quotation omitted).

The record here shows that at the end of a pretrial hearing held on September 6, 2019, Petitioner briefly mentioned that he was "trying to talk to an attorney." (ECF No. 11-6, at 8).[1] The court did not follow up on this statement as it was focused on

[1] Petitioner's reply brief refers to earlier pretrial hearings where he successfully requested the appointment of another attorney. (ECF No. 13, PageID.2138, 2140).

ascertaining whether Petitioner would accept or reject the final plea offer that was the subject of the hearing.

On October 15, 2019, the morning of jury selection, Petitioner indicated that his family had retained a lawyer for him. Petitioner stated "I'm asking of the Court to allow my hired attorney, who is a trial attorney, to represent me, and allow time to acclimate himself to the case so that I may have the representation that I feel I need. And my family actually found this attorney and went all out to get him." (ECF No. 11-7, at 5). Petitioner's appointed counsel informed the court that he was ready to proceed himself, but that he had seen that a private attorney had visited Petitioner in the jail log. (*Id.* at 6-7).

The trial court noted that it's "general approach is that if Defendant wants to do that, that's his perfect right, and I have no objection to it." (*Id.* at 7). The court noted, however, that retained counsel had not contacted the court, was not present, and had not filed an appearance. The Court went on to deny the request as follows:

> This is the first I've heard of this matter. No attorney has filed an appearance or even a limited appearance for the sole purpose of seeking a continuance, and therefore it seems to me there is no other attorney currently in the picture to be considered. This case was filed back in mid-March as I recall, and we are now in mid-October. It probably should have been tried a couple of months ago. I understand it was adjourned once or twice for reasons that are not immediately clear to me since obviously I'm in here as a visiting judge and had no prior history with the file. But it seems to me, in the absence of an

---

These exchanges did not involve Petitioner's request to retain new counsel of choice on the day of trial.

> attorney appearing here today and indicating a willingness to take on Mr. Anderson's case, if he or she could have time to prepare for it and a request by that attorney for a continuance, I don't see that there's really much for us to work with. Mr. Anderson obviously would like to retain this attorney, but evidently either hasn't done so yet, or it's all contingent upon the Court doing something here today. But in the absence of an appearance or any request by another attorney, it seems to me this case having been pending for over eight months or nine months, whatever it's been, should go forward. We have I'm told over 100 jurors in the courtroom ready to be questioned for voir dire and possible placement on the jury to hear the case. Certainly there's been plenty of time for Mr. Anderson to make other arrangements if he wished to do so, and at this point nothing having been formalized, I don't see any valid basis for a continuance. Therefore, I will direct that we recess to go back into the courtroom and get underway with the jury selection.

(*Id.* at 8-9).

Petitioner objected that the only reason his retained attorney was not present was because the prosecutor had not agreed to an adjournment. (*Id.* at 9). The trial court rejected the argument stating, "I don't see any basis to continue the matter on such a tentative basis without anything firm in place. Customarily if an attorney wants to substitute in at the 11th hour or at an earlier time, he or she contacts the court and makes necessary arrangements, and that has not happened here." (*Id.* at 10-11).

On direct appeal, after reciting the controlling constitutional standard, the Michigan Court of Appeals found that the trial court did not abuse its discretion because Petitioner "negligently waited until the first day of trial to seek an

adjournment so that the counsel whom he had purportedly retained could prepare for trial." *Anderson*, at 2021 WL 4494478, at *3.

The adjudication of this claim by the state court did not involve an unreasonable application of clearly established Supreme Court law. The Sixth Circuit routinely denies counsel-of-choice claims when the request for substitute counsel is made on the first day of trial. *See, e.g., Jones v. Bradshaw*, 46 F.4th 459, 474-475 (6th Cir. 2022) (denial of request to retain new counsel on first day of trial did not violate Sixth Amendment); *Abraitis v. Horton*, No. 19-2369, 2020 WL 2730798, *4–5 (6th Cir. Apr. 3, 2020) (same); *Gilkey v. Burton*, No. 18-1760, 2019 WL 2970841, *3 (6th Cir. Mar. 22, 2019) (Michigan Court of Appeals reasonably found that denial of substitution of counsel on the first day of trial would have been unreasonably disruptive); *Nelson v. Jackson*, No. 16-2623, 2017 WL 5624278, *3 (6th Cir. July 17, 2017) ("The request for substitute counsel was made on the first day of trial. Reasonable jurists would not debate that it was therefore untimely.")

Indeed, the extraordinary deference afforded to a trial court's decision to deny a request for substitute counsel as untimely extends to motions made a week or more before trial. *See, e.g., Brown v. Corrigan*, No. 22-1864, 2023 U.S. App. LEXIS 3650, *4 (6th Cir. Feb. 15, 2023) ("extraordinary deference" given to trial judge's decision to deny request for substitute counsel made six days before trial); *United States v. Vasquez*, 560 F.3d 461, 467 (6th Cir. 2009) (request made two weeks before trial

properly denied); *United States v. Chambers*, 441 F.3d 438, 447 (6th Cir. 2006) (request made one and a half months before trial properly denied).

Given that Petitioner's request was made on the first morning of trial, at the bare minimum, "fairminded jurists could disagree," *Harrington*, 562 U.S. at 101, as to whether the decision was "unreasoning and arbitrary," *Morris*, 461 U.S. at 11-12, or a proper exercise of its broad discretion. Accordingly, the Michigan Court of Appeals' rejection of Petitioner's counsel-of-choice claim was not an unreasonable application of clearly established federal law.

*B. Procedural Default*

Petitioner's remaining claims raise issues regarding the composition of the jury, the prosecutor's compliance with a discovery order, the prosecutor's use of Petitioner's pre-arrest silence, and the presentation of other-acts evidence. Respondent asserts that these claims are procedurally barred from review.

A state habeas petitioner's claim is procedurally barred from federal habeas review when (1) the petitioner fails to comply with an applicable state procedural rule, (2) the state court declines to review the merits of the claim on that basis, and (3) the state procedural rule is an independent and adequate ground for precluding federal habeas relief. *Theriot v. Vashaw*, 982 F.3d 999, 1003 (6th Cir. 2020).

*1. Failure to Comply with State Procedural Rules*

Petitioner's second claim asserts that his jury was not drawn from a fair cross-section of the community in violation of *Duren v. Missouri*, 439 U.S. 357, 364 (1979). While questioning a prospective juror during jury selection, defense counsel stated "And the last issue I want to discuss is race. Barry County's mostly white. The jury, prospective jury members are mostly white. Everyone inside the podium aside from Mr. Anderson is white. Mr. Torres [prospective juror] … is there anything about Mr. Anderson not being of the same racial structure of the vast members of the jury that would have any influence…." (ECF No. 11-7, at 69). Beyond eliciting a response to his question from the prospective jurors, defense counsel did not press any issue regarding the composition of the jury venire with the trial court.

The Sixth Circuit recognizes that Michigan law requires a criminal defendant to preserve claims of trial error with a contemporaneous objection. *See Maddox v. LaFave*, No. 24-1969, 2025 WL 3140968, *6 (June 23, 2025) (citing *Theriot*, 982 F.3d at 1004). Trial errors are preserved under Michigan law by making "a timely and specific objection." *People v. Clark*, 330 Mich. App. 392, 433 (2019). "An issue is not properly preserved without a specific and clear objection for stated reasons that enables a trial judge to rule clearly and definitively on an assignment of error." *In re Forfeiture of $19,250*, 209 Mich. App. 20, 29 (1995).

Defense counsel questioned a prospective juror about the racial composition of the jury and whether it would have an impact on his ability to serve. Counsel did not present a challenge to the trial court regarding the composition of the jury under *Duren* that required it to make a ruling, and therefore he failed to comply with Michigan's contemporaneous objection rule.

Petitioner's third claim asserts that the prosecutor violated state discovery rules by failing to disclose photos found on the complainant's phone of her bruised face and the fact that Petitioner's gun was seized from his attic. When testimony was elicited about the photo, defense counsel objected that "I don't object to the representation as far as this is [the] young lady in the photograph. I object to the bruising. I don't know about this phone up until this moment. So I don't object to the representation, but I do object to pretty much everything else." (ECF No. 11-7, at 235). When testimony was offered regarding the discovery of the gun, defense counsel stated, "Objection, relevance. Also beyond the scope of redirect." (ECF No. 11-8, at 183).

Defense counsel did not claim in either case that the prosecutor violated the rules of discovery under Michigan Rule of Criminal Procedure 6.201(J), as he argued on appeal. (ECF No. 11-11, PageID.1911). Petitioner thus failed to comply with the Michigan procedural rule requiring that an objection be made on the same legal

ground that is presented on appeal. *See Arias v. Lafler*, 511 F. App'x 440, 445 (6th Cir. 2013).

Petitioner's fourth claim asserts that the prosecutor improperly used his pre-arrest silence against him at trial. This claim involves three separate incidents. The first challenged statement occurred during opening statements when the prosecutor stated that police unsuccessfully attempted to persuade Petitioner to provide bank records to prove that he did not purchase the Plan B pill. (ECF No. 11-7, at 155-56). No objection was made to this statement. The second incident occurred when the prosecutor questioned a detective about a phone call he made to Petitioner asking for the bank records. (ECF No. 11-8, at 227-28). Defense counsel objected "because I expect the inference is going to be there were no bank records provided cooperatively, and somehow that's an inference of guilt." (*Id.* at 228). The trial court sustained the objection after the detective testified that Petitioner told him that his attorney informed him not to talk to the officer. (*Id.* at 229). The final incident occurred during closing arguments when the prosecutor stated that Petitioner's bank records had to be obtained "the hard way." (ECF No. 11-9, at 98). No objection was made to this statement.

Petitioner clearly failed to comply with Michigan's contemporaneous objection rule with respect to the first and third incident. The analysis with respect

to the second incident is a bit more complicated because Petitioner's objection was sustained. That wrinkle will be discussed below.

Petitioner's fifth claim asserts that the trial court erroneously admitted prior bad acts evidence in violation of Michigan Rule or Evidence 404(b). The claim is based on the admission of the photos of the complainant's bruised face and the gun retrieved from the attic. (ECF No. 11-11, PageID.1919). Petitioner never objected to this evidence at trial based on Rule 404(b) but did so on other bases. He therefore failed to comply with Michigan's rule requiring that an objection be made on the same basis as that presented on appeal. *Arias*, 511 F. App'x at 445.

*2. Procedural Rule is Basis for Decision*

With respect to each of these claims the Michigan Court of Appeals explicitly found that Petitioner failed to properly preserve the claims in the trial court, and it subjected the claims to the "plain error" standard. *Anderson*, at 2021 WL 4494478, at *3 (Claim II), *4 (Claim III), *6 (Claim IV), and *7 (Claim V). By limiting review to the plain-error standard the state court based its decision on Petitioner's failure to comply with a state procedural rule. *See Theroit*, 982 F.3d at 1003-04 (citing *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001) ("[W]e view a state appellate court's review for plain error as the enforcement of a procedural default.").

As mentioned, the analysis is somewhat more complicated with respect to the second allegation supporting Petitioner's fourth claim. The trial court sustained

defense counsel's objection when the prosecutor elicited testimony that Petitioner failed to voluntarily turn his bank records over to the police. (ECF No. 11-8, at 227-29). In rejecting the claim, the court of appeals noted that Petitioner failed to request relief beyond having the objection sustained. *Anderson*, at 2021 WL 4494478, at *6-7. The state court concluded that any claim for further relief was therefore "extinguished" by Petitioner's "approv[al] of the trial court's action." *Id.*

The basis for this decision amounted either to the enforcement of the contemporaneous-objection rule, *see West v. Seabold*, 73 F.3d 81, 84-85 (6th Cir. 1996), or acted to waive any claim for further relief. *See McKissic v. Birkett*, 200 F. App'x 463, 471 (6th Cir. 2006). Viewed either way, the state court expressly declined to review the allegation on the merits because Petitioner failed to seek additional relief in the trial court after his objection was sustained.

*3. Adequate and Independent State Ground*

Finally, Michigan's contemporaneous-objection rule "constitutes an adequate and independent state ground for foreclosing federal review." *Theroit*, 982 F.3d at 1004 (quoting *Taylor v. McKee*, 649 F.3d 446, 451 (6th Cir. 2011).

Petitioner's remaining claims are therefore procedurally defaulted. He failed to follow procedural rules in the trial court for preserving his claims, the state court relied on that failure as a basis for denying relief, and the rules at issue are independent of federal law and adequate to support the state court decision.

*C. Exceptions to Procedural Default*

There are two avenues of review for procedurally defaulted claims. A habeas petitioner may either demonstrate (1) "cause and prejudice" to excuse the default, or (2) that a fundamental miscarriage of justice would result from a lack of review. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986).

*1. Cause and Prejudice*

With respect to the first avenue, to demonstrate cause a petitioner must establish that some objective factor that was external to the defense caused the default. *Murray*, 477 U.S. at 488. Such reasons include such things as: interference by government officials, attorney error rising to the level of ineffective assistance of counsel, or a showing that the factual or legal basis for a claim was not previously reasonably available. *See McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991).

The only obvious candidate for a cause argument here is the claim that Petitioner's trial counsel was ineffective for failing to preserve these issues at trial. Petitioner presented this argument to the Michigan Court of Appeals, but only with respect to his fourth claim. (ECF 11-11, PageID.1915-16).

As for Petitioner's failure to preserve his second, third, and fifth claims, he did not exhaust an ineffective assistance of counsel claim. When a petitioner claims ineffective assistance of counsel as cause for a procedural default, the allegation of

ineffectiveness is a separate claim which must itself be exhausted in state court according to the normal procedures. *Edwards v. Carpenter*, 529 U.S. 446, 452 (2000); *Murray*, 477 U.S. at 489 ("The exhaustion doctrine…generally requires that a claim of ineffective assistance of counsel be presented to state courts before it may be used to establish cause for a procedural default."). The failure to exhaust the ineffectiveness claim prevents a federal court from considering it as a ground for establishing cause. *Edwards*, 529 U.S. at 452.

Accordingly, the Court may only consider ineffective assistance of counsel inasmuch as it forms a basis for establishing cause to excuse Petitioner's failure to object to his fourth claim involving the prosecutor's use of his failure to cooperate with police.

To establish ineffective assistance of counsel, a defendant must show deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish deficient performance, counsel must have made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. To establish prejudice, counsel's errors must have been so serious that they deprived the defendant of a fair trial, a trial whose result is reliable. *Id*. at 687. *Strickland's* prejudice inquiry "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. Unreliability or unfairness does not result if the

ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (citations omitted).

Petitioner cannot show that he was prejudiced by his counsel's failure to properly preserve his fourth claim.

First, Petitioner cannot show prejudice because he had no "substantive or procedural right" to the exclusion of remarks or evidence regarding his pre-arrest silence. *Lockhart*, 506 U.S. at 372. In *Salinas v. Texas*, 570 U.S. 178, 181-84 (2013), the Supreme Court held that a prosecutor may use a defendant's pre-arrest silence as substantive evidence of his guilt. It follows that a defendant who argues that his counsel was ineffective for failing to challenge the use of pre-arrest silence cannot show that his counsel's failure to object resulted in *Strickland* prejudice. *See Abby v. Howe*, 742 F.3d 221, 228 (6th Cir. 2014); *Woodmore v. Tanner*, No. 25-1085, 2025 U.S. App. LEXIS 16892, *9-10 (6th Cir. July 8, 2025) (denying certificate of appealability on claim that counsel was ineffective for failing to object to prosecutor's use of the petitioner's pre-arrest silence).

The Court notes that there is evidence that Petitioner made reference to his attorney's advice when he declined to cooperate with police. The conversation between the detective and Petitioner occurred over the telephone before he was in custody. (ECF No. 11-8, at 228). When asked how Petitioner responded to the

request, the detective testified, “He told me that his attorney said he shouldn’t talk to me.” (*Id.* at 229). The trial court agreed with defense counsel and sustained the objection because “I think actually what we have demonstrated here is that the Defendant exercised his right not to speak to the police or to say anything, which as we brought out I think in the preliminary phases of this case is perfectly within his right.” (*Id*.).

The fact that Petitioner did not cooperate because his attorney told him not to did not necessarily provide a basis for excluding the testimony. The *Salinas* Court expressly declined to rule on the admissibility of pre-arrest silence where a defendant invokes his right to silence. *Id.* at 183. As far as clearly established Supreme Court law is concerned, the use of Petitioner’s pre-arrest silence was permissible even if he said he did not want to talk to police based on the advice of his attorney. *See Miles v. Floyd*, No. 24-1096, 2024 U.S. App. LEXIS 16220, *4-6 (July 2, 2024) (denying certificate of appealability on similar claim challenging use of pre-arrest silence where petitioner indicated his desire to end non-custodial police interview and for an attorney).

Second, the defaulted claim involves two brief unobjected remarks in opening statement and closing argument, and one exchange with the detective where the objection was sustained. The record shows that counsel was aware of the issue because he objected during the detective’s testimony. His decision not to object to

the two other remarks was presumptively the result of a reasonable tactical judgment not to highlight the issue. *See Robinson v. United States*, 625 F. App'x 721, 724 (6th Cir. 2015) (counsel made permissible tactical judgment not to object to reference to defendant's post-arrest silence).

Third, when counsel objected during the detective's testimony, the trial court agreed and informed the jury that Petitioner was "perfectly within his right" not to "speak to the police or to say anything." (ECF No. 11-8, at 229). Because the trial court sustained the objection and informed the jury that Petitioner had a right not to speak with the police any prejudicial impact of the testimony was mitigated. The Court also notes that this case was more than word-against-word. The complainant's account was corroborated by her broken phone, photographs of her bruised face, records showing that Petitioner's funds were used to purchase the Plan B pill, and her mother's testimony that the pill was not purchased for her. Adding additional objections during opening statement and closing argument might have yielded a similar ruling by the trial court, but two more rulings informing the jury that Petitioner was not required to cooperate with police would not have, with reasonable probability, altered the result of the trial. *Strickland*, 466 U.S. at 694.

Accordingly, Petitioner cannot demonstrate *Strickland* prejudice to excuse the procedural default of his fourth claim, and he may not use an unexhausted ineffective assistance of counsel claim to excuse the procedural default of his other claims.

*2. Fundamental Miscarriage of Justice*

The second exception to the procedural default rule—the one concerned with avoiding a fundamental miscarriage of justice—requires a habeas petitioner to demonstrate that a constitutional violation has "probably resulted" in the conviction of one who is factually innocent. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 496). The petitioner must show "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *McQuiggin v. Perkins*, 569 U.S. 383, 399 (2013) (internal quotation marks omitted) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). For a petitioner to pass through this gateway and be permitted to argue the merits of a defaulted claim, he must show "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error." *Id*. at 401 (internal quotation marks omitted) (quoting *Schlup*, 513 U.S. at 316). Petitioner has not presented the court with a claim based on new evidence that he is actually innocent to satisfy this exception.

Accordingly, Petitioner procedurally defaulted his remaining habeas claims, and he fails to establish entitlement to review either by demonstrating cause and prejudice or a fundamental miscarriage of justice.

As Petitioner has failed to demonstrate entitlement to relief with respect to any of his claims, the petition will be denied.

*D. Certificate of Appealability*

In order to appeal the Court's decision, Petitioner must obtain a certificate of appealability. 28 U.S.C. § 2253(c)(2). The applicant is required to show that reasonable jurists could debate whether the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States*, 310 F.3d 900, 901 (6th Cir. 2002). Here, jurists of reason would not debate the Court's conclusion that Petitioner has failed to demonstrate entitlement to habeas relief with respect to his claims.

In the Court's view, Petitioner's strongest claim is his defaulted fourth claim. The Sixth Circuit, however, recently denied a certificate of appealability in a similar situation. *See Miles v. Floyd*, No. 24-1096, 2024 U.S. App. LEXIS 16220, *4-6 (July 2, 2024); *compare also Woodmore v. Tanner*, No. 25-1085, 2025 U.S. App. LEXIS 16892, *9-10 (6th Cir. July 8, 2025). Accordingly,

It is **ORDERED** that the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE**.

It is further **ORDERED** that the certificate of appealability is **DENIED**.

s/Robert J. White
Robert J. White
United States District Judge

Dated: September 23, 2026